IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re | B263838 |
| | (Super. Ct. No. TA115993) |
| CHARLES HOLMES, JR. | |
| | ORDER |
| on | |
| Habeas Corpus. | |

COURT OF APPEAL - SECOND DIST.

**FILED**

JUL 6 - 2015

JOSEPH A. LANE          Clerk

V. GRAY

Deputy Clerk

BY THE COURT:*

The petition for writ of habeas corpus, filed May 6, 2015, has been read and considered with the opinion filed on appeal (*People v. Holmes* (May 24, 2013, B239704) [nonpub. opn.]) The petition, and petitioner's accompanying request for an evidentiary hearing, are denied. Some of the issues raised were determined on appeal and will not be reconsidered in a petition for an extraordinary writ (*In re Clark* (1993) 5 Cal.4th 750, 765-766) and the remaining claims should have been raised in petitioner's appeal from his judgment of conviction (See *In re Reno* (2012) 55 Cal.4th 428, 490-493; *In re Dixon* (1953) 41 Cal.2d 756, 759; *In re Walker* (1974) 10 Cal.3d 764, 773).

*EDMON, P. J.          KITCHING, J.          JONES, J.**

**Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

114

# EXHIBIT COVER PAGE

| $\mathcal{C}$ |
|:---:|
| EXHIBIT |

Description of this Exhibit: Documents of Ronald White Bar Discipline.

Number of pages to this Exhibit: 26 pages.

JURISDICTION:  (Check only one)

- [ ] Municipal Court
- [ ] Superior Court
- [ ] Appellate Court
- [ ] State Supreme Court
- [x] United States District Court
- [ ] State Circuit Court
- [ ] United States Supreme Court
- [ ] Grand Jury

FILED JUNE 6, 2014

STATE BAR COURT OF CALIFORNIA

HEARING DEPARTMENT – LOS ANGELES

| | |
|---|---|
| In the Matter of<br><br>**RONALD WHITE,**<br><br>Member No. 85723,<br>A Member of the State Bar. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case Nos.: 12-O-15405 (12-O-15555;<br>　　　　12-O-16212); 12-O-10161-DFM<br>　　　　(Cons.)<br>**DECISION INCLUDING DISBARMENT<br>RECOMMENDATION AND<br>INVOLUNTARY INACTIVE<br>ENROLLMENT ORDER** |

## INTRODUCTION

Respondent **Ronald White** (Respondent) was charged at trial with eight counts of misconduct, involving four different client matters.[1]  The counts included allegations that Respondent willfully violated (1) Business and Professions Code section 6106 (moral turpitude - breach of fiduciary duty);[2] (2) section 6068, subdivision (a) (failure to comply with laws – breach of common law fiduciary duty); (3) section 6106 (moral turpitude - misappropriation); (4) section 6106 (moral turpitude - misrepresentation); and (5) section 6068, subdivision (i) (failure to cooperate in State Bar investigation)[four counts].  The State Bar had the burden of proving the above charges by clear and convincing evidence.  The court finds culpability, as set

---

[1] As will be discussed below, ten of the thirteen counts in the initial notice of disciplinary charges were dismissed by the State Bar prior to the trial date in this matter.

[2] Unless otherwise noted, all future references to section(s) will be to the Business and Professions Code.

1

forth below.  In view of Respondent's misconduct and the aggravating factors, the court

recommends, inter alia, that Respondent be disbarred from the practice of law.

## PERTINENT PROCEDURAL HISTORY

The Notice of Disciplinary Charges (NDC) in case Nos. 12-O-15405 (Payne),

12-O-15555 (Nelson), and 12-O-16212 (Newell) was filed by the State Bar of California on

June 3, 2013.  The NDC contained 13 counts, including charges of misrepresentation, failing to

act with competence [two counts], failing to respond to client inquiries, failing to refund

unearned fees [two counts], failing to inform client of significant developments [three counts],

failing to release client's file, and failing to cooperate in a State Bar investigation [three counts].

On July 18, 2013, Respondent filed his response to the NDC, denying culpability of any of the

thirteen counts.

An initial status conference was held in the matter on July 15, 2013.  At that time the case

was given a trial date of October 1, 2013, with a five-day trial estimate.

On October 1, 2013, this court was in overseeing a lengthy trial in another matter.  As a

result, the trial in this case was continued to January 22, 2014.

On January 17, 2014, on the eve of the new scheduled trial date, the State Bar

successfully moved to dismiss 10 of the 13 pending counts in the Payne, Nelson and Newell

matters retaining only the three counts that Respondent had failed to cooperate in the State Bar's

investigations of those matters.  Those remaining three counts were disputed by Respondent.  At

that same time, because Respondent was required to be present in a superior court matter at the

same time as the scheduled trial in this matter, the trial of this matter was continued to March 21,

2014.

On March 17, 2014, the State Bar was in the process of filing charges against Respondent

in a new matter (case No. 12-O-10161[Giorgi]).  As a result, Respondent filed a motion on that

date to continue the pending trial in order that the cases might be consolidated and tried at one time. On March 18, 2014, the State Bar filed an opposition to the motion, based on Respondent's alleged delay in making the request.

Prior to calling the matter for trial on March 21, 2014, this court convened a status conference for the purpose of addressing the motion to continue the trial. The State Bar had still not filed charges in case No. 12-O-10161, but informed the court that it would soon be doing so. While the State Bar did not waive its opposition to the continuance, the parties agreed and the court ordered as follows:

- o  The pending cases were abated for two weeks.

- o  The scheduled trial date was vacated.

- o  The State Bar was expected to file an NDC in case No. 12-O-10161 during the following two weeks. On the date that the NDC was filed, the State Bar was required both to serve the NDC in the manner required by the rules and transmit by fax, email, or personal delivery a copy of the NDC to Respondent.

- o  Immediately on filing, the new case would be deemed consolidated with the previously-filed cases. In addition, each side was deemed to have made and received a discovery request pursuant to rule 5.65 of the Rules of Procedure of the State Bar on the date the NDC is filed. The provision in rule 5.65 delaying the making of any such discovery request was waived by the parties.

- o  The consolidated cases were made subject to the provisions of this court's trial-setting order of July 15, 2013, with the following modifications:

  (1) Trial would commence on May 20, 2014, with a four-day trial estimate;
  (2) a pretrial conference would be held in-person on May 12, 2014, at 10:30 a.m.;
  (3) pretrial statements would be filed on or before May 9, 2014; and
  (4) the deadline for lodging exhibits was May 12, 2014.

On March 24, 2014, the State Bar filed a Notice of Disciplinary Charges (NDC) in case No. 12-O-10161. On April 21, 2014, Respondent filed a motion to dismiss that NDC, alleging

3

that it did not state disciplinable offenses and that Respondent was precluded from responding to the allegations by his attorney-client relationship with Curtis Peterson.

On May 5, 2014, the State Bar filed an opposition to the motion to dismiss.

On May 6, 2014, this court denied the motion to dismiss, finding that each of the counts alleged sufficient facts to state a disciplinable offense; that each count cited the specific statute or rule supporting its allegation of misconduct; and that Respondent's arguments were based on his contention that the factual allegations were untrue. Such arguments do not support a motion to dismiss directed at the sufficiency of the NDC. This court also found that Respondent's claim, that he was unable to respond to the allegations of the NDC due to his relationship with Curtis Peterson, also depends on his denial of the accuracy of the allegations of the NDC and ignored the fact that the fiduciary duties alleged in the NDC allegedly arose from Respondent's relationship with John Giorgi, not Peterson. Since Respondent disavowed having any attorney-client relationship with Giorgi, no privilege would apply to Respondent's dealings with him.[3] Respondent was then ordered to file a written response to the NDC prior to the commencement of the consolidated trial on May 20, 2014.

Trial was commenced on May 20, 2014. A new motion by Respondent to continue the trial was denied at that time, as was a motion by the State Bar to exclude Respondent's evidence. Because Respondent had not yet complied with the May 6, 2014 order to file his written response to the NDC prior to the commencement of trial, all of the allegations of the NDC were deemed disputed by Respondent for purposes of going forward with the trial, and Respondent

---

[3] At trial, the court concluded that the crime-fraud exception of Evidence Code section 956 applied to Respondent's communications with Peterson, thereby allowing Respondent to testify regarding those communications to seek to explain his actions.

4

was directed to file his response forthwith or have his default entered.  On May 23, 2014,

Respondent filed his response to the NDC.[4]

Trial was completed on May 21, 2014.  During the course of the trial, the parties

executed and filed a written stipulation regarding the bulk of the underlying facts in the three

initial three cases.  The State Bar was represented at trial by Deputy Trial Counsel Agustin

Hernandez.  Respondent acted as counsel for himself.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following findings of fact are based on Respondent's responses to the NDCs, the

stipulation of undisputed facts filed by the parties, and the documentary and testimonial evidence

admitted at trial.

#### Jurisdiction

Respondent was admitted to the practice of law in California on May 31, 1979, and has

been a member of the State Bar at all relevant times.

#### Case No. 12-O-15405 (Payne Matter)

On August 29, 2012, a State Bar investigator mailed a letter to Respondent at his official

State Bar membership records address regarding a complaint made by Kevin Payne.  The State

Bar investigator's August 29, 2012 letter requested that Respondent respond in writing to

specified allegations of misconduct being investigated by the State Bar in Payne's complaint by

September 12, 2012.  Respondent received the letter but did not respond to it.

---

[4] On May 28, 2014, Respondent filed a motion for reconsideration of this court's denial of his
motion to dismiss and his motion to continue the trial.  The motion fails to set forth any good
cause or other basis under rule 5.115 of the Rules of Procedure of the State Bar for any relief
from this court's prior rulings.  Therefore, the motion is denied in its entirety.

**Count 5 – Section 6068, subd. (i) [Failure to Cooperate in State Bar Investigation]**

Section 6068, subdivision (i), of the Business and Professions Code, subject to constitutional and statutory privileges, requires attorneys to cooperate and participate in any disciplinary investigation or other regulatory or disciplinary proceeding pending against that attorney.

By failing to respond to the letter of the State Bar's investigator, Respondent willfully violated section 6068, subdivision (i). (*In the Matter of Bach* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 631, 644 [attorney may be found culpable of violating § 6068, subd. (i), for failing to respond to State Bar investigator's letter, even if attorney later appears and fully participates in formal disciplinary proceeding].) While Respondent alleges in his response to the NDC that his failure to respond to the State Bar's investigation was a result of his busy schedule, that fact does not excuse an attorney's failure to comply with the statutory duty to cooperate with the State Bar's investigation.

**Case No. 12-O-15555 (Nelson Matter)**

On August 29, 2012, and September 17, 2012, a State Bar investigator mailed letters to Respondent at his official State Bar membership records address regarding a complaint made by James Nelson. The State Bar investigator's August 29, 2012, and September 17, 2012 letters requested that Respondent respond in writing to specified allegations of misconduct being investigated by the State Bar in Nelson's complaint by September 12, 2012, and October 1, 2012, respectively. Respondent received both of the letters but did not respond to either of them.

**Count 9 – Section 6068, subd. (i) [Failure to Cooperate in State Bar Investigation]**

As discussed above, this failure by Respondent to respond to the letters of the State Bar's investigator in the Nelson State Bar disciplinary investigation constituted a willful violation by him of section 6068, subdivision (i).

6

**Case No. 12-O-16212 (Newell Matter)**

On January 29, 2013, and February 12, 2013, a State Bar investigator mailed letters to Respondent at his official State Bar membership records address regarding a complaint made by Annette Coleman on behalf of Michael Newell. The State Bar investigator's January 29, 2013, and February 12, 2013 letters requested that Respondent respond in writing to specified allegations of misconduct being investigated by the State Bar regarding the Newell complaint by February 12, 2013, and February 26, 2013, respectively. Respondent received both of the letters but did not respond to either of them.

### Count 12 – Section 6068, subd. (i) [Failure to Cooperate in State Bar Investigation]

As discussed above, the above failure by Respondent to respond to the letters of the State Bar's investigator in the Newell State Bar disciplinary investigation constituted a willful violation by him of section 6068, subdivision (i).

**Case No. 12-O-10161 (Giorgi Matter)**

In 2009, Respondent was approached by Curtis Peterson (Peterson) about the possibility of assisting Peterson in dealing with his prospective investment clients. Peterson, using an entity named Express International, LLC, offered to invest money of potential investment clients in purported discounted bank guarantees of certain foreign banks. He contractually assured these investor-clients that they would receive spectacular returns without any risk of losing their invested money. In approaching Respondent about the possibility of participating in the transactions, Peterson told Respondent that these prospective clients would feel more secure wiring their money into an attorney's client trust account in order to be assured that Peterson "would not run off with it." In exchange for Respondent using his client trust account (CTA) to function in that intermediary position, Respondent testified that he was to receive $3,500 for

each transaction.  Respondent agreed to the arrangement and authorized Peterson to provide his name and bank information to prospective investors.

In October 2009, John Giorgi (Giorgi), an attorney in New Jersey, decided to invest funds with Peterson's company.  He had been told that his funds were to be held in escrow in Respondent's client trust account by Respondent, a licensed California attorney.

After assuring himself that Respondent was a licensed attorney in California and that the bank account was as represented, Giorgi executed an Escrow/Joint Venture/Contract with Peterson's company, whereby he agreed to invest $820,000.  The written contract identified Respondent as the escrow holder, provided information for how money was to be transferred into Respondent's client trust account, made an express representation that the funds "are not at risk," and specified the following with regard to Respondent's duties as escrow holder:

> Escrow Holder's duties hereunder shall be limited to the proper handling of such monies received into escrow holder's account and the proper purchase and safe keeping of such instruments in this transaction.  Authorization is given to escrow holder to prepare, obtain and deliver the instruments to carry out the terms and conditions.

> Escrow Holder shall acknowledge receipt of $USD $820,000 (Eight Hundred Twenty Thousand dollars) in cash or wire transfer which can be given immediate availability upon deposit.  Any principal instructing escrow holder to cancel this escrow shall file notice of cancellation in writing escrow holder will return funds within 10 (ten) business days, if such right is exercised, all funds shall be returned to the party who deposited them and escrow holder shall have no liability hereunder.  [Sic.]

This agreement was purportedly executed by both Peterson and Respondent.  On November 3, 2009, Giorgi wired $820,000 into Respondent's CTA.

Shortly thereafter, Giorgi decided to increase his investment with Peterson's company.  A new Escrow/Joint Venture/Contract with Peterson's

8

company was prepared and signed, by which Giorgi agreed to increase his total investment to $1,070,000. The agreement was essentially identical to the prior agreement, except for the date and amount of the investment. Again, it purported to have been signed by Respondent as the escrow holder. Pursuant to that agreement, Giorgi wired an additional $250,000 into Respondent's CTA on November 10, 2009, for a total investment of $1,070,000.

Notwithstanding the provisions of the Escrow agreements, Giorgi's understanding that Respondent was serving to safeguard the money, and Respondent's awareness that money was being wired into his account to prevent Peterson from running away with it, Respondent made absolutely no effort to safeguard the funds or to see that they were disbursed for proper purposes. Instead, Peterson had notified Respondent in advance that funds were going to be wired into the account and Peterson and Respondent had made arrangements to meet at Respondent's bank as soon as the funds were received. Once the two were at the bank, Respondent removed the funds from his account and disbursed them according to oral instructions provided by Peterson. Of the $820,000 deposited on November 3, 2009, Respondent removed $810,000 on the very next day, November 4, 2009. The $250,000 deposited by Giorgi on November 10, 2007, was removed by Respondent on the very same day.

None of Giorgi's funds were used by Respondent for the purposes specified in the escrow agreement. The vast majority of these funds were merely turned over to Peterson by Respondent, sometimes with by cashier's check made payable to Peterson personally, sometimes by a cashier's check to one of Peterson's companies, and sometimes in cash. Other portions of Giorgi's funds were disbursed by Respondent to Peterson's church and to various individuals completely unknown to Respondent. Significantly, Respondent also disbursed $30,000 of the funds to himself, despite the fact that he had provided no legal services of any value.

9

Respondent characterized these fees as a "bonus" paid to him by Peterson based on how well the Peterson's business was doing. Respondent was unconcerned over the fact that the bonus was being paid out of funds belonging to the investors and entrusted to Respondent as a fiduciary for safe-keeping.

Giorgi was expecting to begin receiving installments payments within a month, reflecting the guaranteed return on his investment. When he had not received the anticipated first payment, he telephoned Respondent in December 2009 to find out what was going on. During the telephone call, Respondent affirmed that he was acting as the escrow holder pursuant to the agreement, told Giorgi that no investments had been made because the various banks had changed their protocols, and sought to comfort Giorgi about the investment, telling him to be patient. He did not tell Giorgi that virtually all of the funds had already been disbursed by him from the account.

On January 24, 2010, when Giorgi had still not received any money, he again telephoned Respondent to express his concerns. During that call, Respondent again stated that there had been no purchases made with the money and falsely assured Giorgi that all of the funds remained in his client trust account. In fact, by that date all of the funds had been disbursed from the account.

After the phone calls, Respondent had notified Peterson of Giorgi's calls and was told not to talk any further with Giorgi. Although Giorgi subsequently made numerous calls to Respondent about the status of the $1,070,000 investment and left numerous messages seeking a reply, Respondent did not respond to any of them.

On February 4, 2010, Giorgi faxed a letter to Respondent, demanding that his money be returned. He also asked that Respondent acknowledge receipt of the letter. Respondent received the letter but did nothing either to discuss the matter with Giorgi or to return any money to him.

Instead, Respondent turned the demand over to Peterson, who wrote a letter to Giorgi, stating that they were then in the process of making investments, with the first payout now being scheduled for March 1, 2010. On February 24, 2010, Peterson again wrote Giorgi to say that the payout was being delayed. In fact, there was never going to be a payout.

In June, September, and October 2010, Giorgi again made written demands on Respondent for a return of his funds, together with an accounting. Respondent did not respond to the demands or the letters. Giorgi then complained to the State Bar and to the Securities and Exchange Commission (the SEC).

On February 11, 2011, the SEC filed a complaint for securities violations against Peterson, Eric Maher, Express International, LLC, and Respondent. The complaint alleged:

> This matter concerns a fraudulent offering scheme operated by Curtis Peterson ("Peterson"), Eric Maher ("Maher"), and Express International, LLC ("Express International"), and aided and abetted by attorney Ronald White ("White") (collectively, the "Defendants"). From September through December 2009, the Defendants raised almost $3.3 million from at least 10 investors through an unregistered offering of securities in the form of investment contracts. Peterson and Maher told investors that they would pool their monies to purchase international bank instruments, then "lease" those instruments to "top 25" international banks willing to pay substantial fees for the right to place the instruments on their balance sheet for a brief period of time. By using the same instrument in multiple transactions per day, they claimed that they would generate profits sufficient to pay investors returns of as much as 1,000% per month for 12 months. Moreover, they promised investors that their monies would remain in a trust account at all times and never be placed at risk.
>
> In reality, none of what Peterson and Maher told investors was true. Specifically, the program does not exist and the promised rates of return cannot be obtained. White, the attorney who controlled the trust account to which Express International investors were instructed to wire their monies, aided and abetted the fraudulent scheme by, among other things, converting investor principal into cashier's checks payable to Peterson, thus allowing Peterson to dissipate investor funds. Indeed, Peterson used only about 20% of investor monies for their avowed purpose and used the remainder to pay his personal expenses and to funnel monies to

11

> third parties with no legitimate claim to them, including Curtis
> International Express, Inc. and Peterson's wife, Ann Scott
> (collectively, the "Relief Defendants").
>
> The Defendants, by engaging in the conduct described in this
> Complaint, violated and/or aided and abetted violations of the
> antifraud, securities registration, and/or broker-dealer registration
> provisions of the federal securities laws.

(Ex. 19, pp. 2-3.)

At another point in the complaint, the SEC alleged that Respondent "knew that Peterson

and Maher were engaged in fraudulent activity[:]"

> White received copies of the investment agreements, which bear
> his signature, and evidenced his familiarity with them by
> discussing their contents with others on several occasions. Those
> contents are so inherently ludicrous as to put White on notice that
> he was furthering a fraudulent scheme.
>
> White knew that he was being compensated almost solely for
> lending an attorney's imprimatur of legitimacy to the Defendants'
> fraudulent scheme because there was no rational relationship
> between the compensation he received and the value of the
> services he rendered. White was paid more than $100,000 - and
> withdrew from the Trust Account more than $400,000 - for
> (1) maintaining the Trust Account to which the investors were
> instructed to wire their money and (2) converting those monies
> into cashier's checks payable to Peterson.

(Ex. 19, p. 10.)

In answer to those charges, Respondent denied that he was aware of the fraudulent

scheme, but admitted "that he maintained an attorney-client trust account into which investor

money was wired and that he followed Peterson's direction as the distribution of funds to and

from his attorney-client trust account." He also admitted "that he was paid slightly more than

$100,000 for his services." (Ex. 20, pp. 3, 7, and 13.)

On January 25, 2012, the United State District Court for the Southern District of

California entered a Final Judgment of Disgorgement, Prejudgment Interest, and Civil Penalty

Against Defendant Ronald White. In that judgment, the court noted that Respondent had consented to entry of a Judgment of Permanent Injunction and Other Relief, which was entered on September 9, 2011, and incorporated into the Final Judgment. The court then "ordered, adjudged, and decreed that defendant White is liable for disgorgement of $596,400, representing proceeds gained as a result of the conduct alleged in the Complaint[.]" In addition, the court ordered Respondent to pay a civil penalty of $150,000.   (Ex. 21, pp. 2-3.)

**Count 1 –Section 6106 [Moral Turpitude – Breach of Fiduciary Duties]**
**Count 2 – Section 6068, subd. (a) [Failure to Support Laws – Breach of Common**
**Law Fiduciary Duty]**
**Count 3 –Section 6106 [Moral Turpitude – Misappropriation]**

Section 6106 prohibits an attorney from engaging in conduct involving moral turpitude, dishonesty, or corruption. While moral turpitude generally requires a certain level of intent, guilty knowledge, or willfulness, a finding of gross negligence will support such a charge where an attorney's fiduciary obligations, particularly trust account duties, are involved. *(In the Matter of Blum* (Review Dept. 2002) 4 Cal. State Bar Ct. Rptr. 403, 410.) An attorney's failure to use entrusted funds for the purpose for which they were entrusted constitutes misappropriation. *(Baca v. State Bar* (1990) 52 Cal.3d 294, 304.)

In Counts 1, 2 and 3 of the NDC, the State Bar charges that Respondent's mishandling of the funds deposited by Giorgi into Respondent's client trust account constituted breaches of fiduciary duties imposed on Respondent by common law and acts of moral turpitude in violation of section 6106, including misappropriation of Giorgi's funds. This court agrees.

At the time Respondent agreed that investors could deposit money into his client trust account, he assumed a fiduciary relationship with those investors and was responsible for the proper handling of their funds. As stated by the Supreme Court, "'When an attorney receives money on behalf of a third party who is not his client, he nevertheless is a fiduciary as to such

13

third party. …'When an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be discipline for his misconduct.'" *(Crooks* v. *State Bar* (1970) 3 Cal.3d 346, 355, quoting *Johnstone v. State Bar* (1966) 64 Cal.2d 153, 155-156; see also *Simmons* v. *State Bar* (1969) 70 Cal.2d 361, 365.)

Respondent was aware that the reason the investors were wiring money into his account, rather than into an account owned by Peterson or his company, was their desire to have the funds safeguarded from mishandling by those parties. Peterson had told Respondent when they were discussing the possibility of Respondent getting involved in the transactions: "I've got people who are going to be investing by me. They want to make sure that I'm not somebody who's just going to run away, whatever. So they want to know if there's a place where they can send their money to me." At trial, after describing the above conversation, Respondent concluded with the comment to the court, "I understood the importance of that." Sadly, his conduct did not reflect that understanding.

Respondent's principal defense here to culpability is his claim that he was also a victim of the dishonesty of his client Peterson and, like Giorgi, had allowed himself to be swindled. This defense is both legally and factually flawed. To begin with, Respondent's testimony that he was unaware at the time that Peterson was mishandling Giorgi's funds was not credible, and the clear and convincing evidence is to the contrary. Further, it must be noted that Giorgi had not been completely swindled by Peterson. Instead, Giorgi had taken affirmative steps to be protected from Giorgi by designating Respondent, as an attorney and fiduciary, to safeguard his funds. It was only when Respondent elected to ignore that fiduciary duty that Giorgi was put at risk.[5]

---

[5] Respondent's testimony, that he was unaware of the escrow agreement, was not credible. Instead, Giorgi testified credibly that Respondent had acknowledged being aware of the escrow

Respondent's actions in turning control of Giorgi's funds immediately over to Peterson (including paying $30,000 of the funds to himself) was intentional, dishonest and knowingly inappropriate. Such actions constituted both a breach by Respondent of his fiduciary duties (Count 1) and multiple intentional misappropriations by him of entrusted funds (Count 3), all actions in willful violation of the prohibition of section 6106 against acts of moral turpitude. [6]

### Count 4 –Section 6106 [Moral Turpitude – Misrepresentation]

In this count the State Bar alleges that Respondent also violated section 6106 by misrepresenting to Giorgi on February 24, 2010, that all of Giorgi's funds still remained deposited in Respondent's client trust account. [7]

The evidence is clear and convincing that Respondent assured Giorgi on January 24, 2010, that Giorgi's funds remained on deposit in Respondent's client trust account at that time. This representation by Respondent was knowingly false and constituted a willful violation by him of section 6106.

### Count 5 –Section 6068, subd. (i) [Failure to Cooperate in State Bar Investigation]

On April 8, 2013, the State Bar opened an investigation pursuant to a complaint made by Giorgi. On May 22, 2013, and June 19, 2013, a State Bar investigator mailed letters to Respondent at his official State Bar membership records address regarding Giorgi's complaint. The State Bar investigator's May 22, 2013, and June 19, 2013 letters requested that Respondent

---

agreement during the Giorgi's telephone conversations with Respondent in December 2009 and January 2010. In addition, when Giorgi sent a letter to Respondent in February 2010, referring both to the escrow agreement and to Respondent's role as escrow holder, Respondent did nothing to communicate to Giorgi any surprise at those statements or any belief by Respondent that he was not acting as an escrow holder.

[6] The same acts support a finding of a willful violation of section 6068, subdivision (a). However, because such a finding would be duplicative here, no additional weight is given to such a finding.

[7] The NDC mistakenly dates this conversation as having taken place on "February 10, 2011." At trial, it was agreed and ordered that the NDC would be deemed amended to replace that date with the correct date of January 24, 2010. (Rules of Proc. of State Bar, rule 5.44(C).)

15

respond in writing to specified allegations of misconduct being investigated by the State Bar regarding the Giorgi complaint by June 5, 2013, and July 3, 2013, respectively. Respondent received both letters but did not respond to either of them.

Respondent's failure to respond to the letters of the State Bar's investigator in the Giorgi State Bar disciplinary investigation constituted a willful violation by him of section 6068, subdivision (i).

At trial, Respondent testified that his failure to provide a response to the above letters resulted from his perceived need to assert constitutional and statutory privileges to the inquiries being made. That explanation, however, does not justify Respondent's failure to provide at least a written response notifying the State Bar that privileges were being asserted. Instead, as concluded by the Review Department of this court in its decision in *In the Matter of Bach*, *supra*, 1 Cal. State Bar Ct. Rptr. at p. 644:

> Section 6068 (i) requires attorneys to respond in some fashion to State Bar investigators' letters. If an attorney wishes to invoke statutory or constitutional privileges which the attorney contends make a substantive response unnecessary, the attorney must nevertheless respond to the investigator's letters, if only to state that the attorney is claiming a privilege. …[R]espondent's failure to respond to the investigator's letters, even by making a claim of privilege, violated section 6068(i), notwithstanding respondent's full participation in the proceedings after the filing of the notice to show cause.

**Aggravating Circumstances**

The State Bar bears the burden of proving aggravating circumstances by clear and convincing evidence. (Rules Proc. of State Bar, Stds. for Atty. Sanctions for Prof. Misconduct, [8] std. 1.5.) [9] The court finds the following with respect to aggravating circumstances.

---

[8] All further references to standard(s) or std. are to this source.
[9] Previously standard 1.2(b).

16

**Prior Discipline**

Respondent has been disciplined on two prior occasions.

In March 2002, the Supreme Court issued an order in State Bar case No. 00-C-10007, disciplining Respondent for the circumstances surrounding his misdemeanor conviction for violating Penal Code section 70(a) [unauthorized emoluments, gratuities or rewards]. In a stipulation executed at that time by the State Bar and Respondent, it was agreed that these circumstances involved a violation of section 6068, subdivision (a), and acts of moral turpitude, including Respondent's misleading his client and fabricating a false community service letter. Respondent was suspended for one year, stayed, and placed on probation for two years on condition that he be actually suspended for three months.

In October 2011, the Supreme Court issued an order disciplining Respondent for violations of (1) Rules of Professional Conduct, rule 3-700(D) [failure to return client file] in two client matters; (2) section 6068, subdivision (m) [failure to inform client of significant developments]; and (3) section 6068, subdivision (i) [failure to cooperate in State Bar investigation]. Respondent was again suspended for one year, stayed, and placed on probation for two years on condition that he be actually suspended for 90 days. The conditions of probation included the requirement that Respondent must comply with the provisions of the State Bar Act and Rules of Professional Conduct during the probation period.

This prior record of discipline is a significant aggravating factor. (Std. 1.5(a).) [10]

**Multiple Acts of Misconduct**

Respondent is culpable of multiple acts of misconduct. This is an aggravating factor. (Std. 1.5(b).[11]

---

[10] Previously standard 1.2(b)(i).
[11] Previously standard 1.2(b)(ii).

17

**Harm**

Standard 1.5(f) [12] provides as an aggravating circumstance that the member's misconduct significantly harmed a client, the public or the administration of justice. Respondent's misconduct here caused significant harm to Giorgi, who has received back only $10,000 of the $1,070,000 to Respondent as a fiduciary in 2009. This is a significant aggravating factor.

**Mitigating Factors**

Respondent bears the burden of proving mitigating circumstances by clear and convincing evidence. (Std. 1.6.) [13] The court finds that no mitigating factors were shown by the evidence presented to this court.

## DISCUSSION

The purpose of State Bar disciplinary proceedings is not to punish the attorney, but to protect the public, preserve public confidence in the profession, and maintain the highest possible professional standards for attorneys. (Std. 1.3; *Chadwick v. State Bar* (1989) 49 Cal.3d 103, 111.) In determining the appropriate level of discipline, the court looks first to the standards for guidance. (*Drociak v. State Bar* (1991) 52 Cal.3d 1085, 1090; *In the Matter of Koehler* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 615, 628.) Although the standards are not binding, they are to be afforded great weight because "they promote the consistent and uniform application of disciplinary measures." (*In re Silverton* (2005) 36 Cal.4th 81, 91-92.) Nevertheless, the court is not bound to follow the standards in talismanic fashion. As the final and independent arbiter of attorney discipline, the court is permitted to temper the letter of the law with considerations peculiar to the offense and the offender. (*In the Matter of Van Sickle* (2006) 4 Cal. State Bar Ct. Rptr. 980, 994; *Howard v. State Bar* (1990) 51 Cal.3d 215, 221-222.)

---

[12] Previously standard 1.2(b)(iv).
[13] Previously standard 1.2(e).

18

In addition, the court considers relevant decisional law for guidance. (See *Snyder v. State Bar* (1990) 49 Cal.3d 1302, 1310-1311; *In the Matter of Frazier* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 676, 703.) Ultimately, in determining the appropriate level of discipline, each case must be decided on its own facts after a balanced consideration of all relevant factors. (*Connor v. State Bar* (1990) 50 Cal.3d 1047, 1059; *In the Matter of Oheb* (Review Dept. 2006) 4 Cal. State Bar Ct. Rptr. 920, 940.)

Standard 1.7(a)[14] provides that, when two or more acts of misconduct are found in a single disciplinary proceeding and different sanctions are prescribed for those acts, the recommended sanction is to be the most severe of the different sanctions. In the present proceeding, the most severe sanction for Respondent's misconduct is found in standards 2.1(a) and 1.8(b). Application of either of those two standards suggests that disbarment is the appropriate discipline to be recommended.

Standard 2.1(a) provides: "Disbarment is appropriate for intentional or dishonest misappropriation of entrusted funds or property, unless the amount misappropriated is insignificantly small or the most compelling mitigating circumstances clearly predominate, in which case actual suspension of one year is appropriate." Here, the amount of money misappropriated by Respondent was clearly not insignificant, and no mitigating circumstances have been demonstrated.

In turn, standard 1.8(b) provides:

If a member has two or more prior records of discipline, disbarment is appropriate in the following circumstances, unless the most compelling mitigating circumstances clearly predominate or the misconduct underlying the prior discipline occurred during the same time period as the current misconduct:
1. Actual suspension was ordered in any one of the prior disciplinary matters;

---

[14] Previously standard 1.6(a).

2.  The prior disciplinary matters coupled with the current
    record demonstrate a pattern of misconduct; or
3.  The prior disciplinary matters coupled with the current record
    demonstrate the member's unwillingness or inability to
    conform to ethical responsibilities."

Standard 1.8(b) applies to the instant matter.  Respondent has been disciplined on two

prior occasions with actual suspension being ordered on both occasions; there are no compelling

mitigating circumstances here; and none of the misconduct here occurred during the same time

period as that resulting in the prior discipline.  In addition, many of Respondent's acts of

misconduct here occurred during the time that Respondent was on probation as a result of his

second discipline, demonstrating his unwillingness or inability to conform to ethical

responsibilities.  Worse, Respondent had been disciplined in 2011 for failing to cooperate in a

State Bar investigation in violation of an important professional obligation imposed by statute.

Despite that prior discipline, Respondent repeatedly failed to respond to State Bar inquiries

about various complaints against him throughout 2012 and 2013.  In such instances, disbarment

becomes necessary and appropriate to protect the public from future misconduct.  That is clearly

the situation here.

A review of the case law also confirms that disbarment is the appropriate discipline to

recommend here.  Misappropriation of client funds has long been viewed by the courts as a

particularly serious ethical violation.  Misappropriation breaches the high duty of loyalty owed to

the client, violates basic notions of honesty, and endangers public confidence in the profession.

*(McKnight v. State Bar (1991)* 53 Cal.3d 1025, 1035; *Kelly v. State Bar* (1988) 45 Cal.3d 649,

656.)  The Supreme Court has consistently stated that misappropriation generally warrants

disbarment in the absence of clearly mitigating circumstances.  *(Kelly v. State Bar, supra*;

*Waysman* v. *State Bar* (1986) 41 Cal.3d 452, 457; *Cain v. State Bar* (1979) 25 Cal.3d 956, 961.)

The Supreme Court has imposed disbarment on attorneys with no prior record of discipline in

20

cases involving a single misappropriation. (See, e.g., *In re Abbott* (1977) 19 Cal.3d 249 [taking of $29,500, showing of manic-depressive condition, prognosis uncertain].) In *Kaplan v. State Bar* (1991) 52 Cal.3d 1067, an attorney with over 11 years of practice and no prior record of discipline was disbarred for misappropriating approximately $29,000 in law firm funds over an 8-month period. In *Chang v. State Bar* (1989) 49 Cal.3d 114, an attorney misappropriated almost $7,900 from his law firm, coincident with his termination by that firm, and was disbarred. (See also *In the Matter of Blum, supra,* 3 Cal. State Bar Ct. Rptr. 170 [no prior record of discipline, misappropriation of approximately $55,000 from a single client]; *In the Matter of Spaith* (Review Dept. 1996) 3 Cal. State Bar Ct. Rptr 511 [misappropriation of nearly $40,000, misled client for a year, no prior discipline]; *Kennedy v. State Bar* (1989) 48 Cal.3d 610 [disbarment for misappropriation in excess of $10,000 from multiple clients and failure to return files with no prior misconduct in eight years]; and *Kelly v. State* Bar, *supra,* 45 Cal.3d 649 [disbarment for misappropriation of $20,000 and failure to account with no prior discipline in seven years].) The misconduct and aggravating factors here are significantly more egregious than the facts of any of the above cases.

## RECOMMENDED DISCIPLINE

### Disbarment

The court recommends that respondent **Ronald White,** Member No. 85723, be disbarred from the practice of law in the State of California and that his name be stricken from the Roll of Attorneys of all persons admitted to practice in this state.

### California Rules of Court, Rule 9.20

The court further recommends that Respondent be ordered to comply with California Rules of Court, rule 9.20 and to perform the acts specified in subdivisions (a) and (c) of that rule

within 30 and 40 calendar days, respectively, after the effective date of the Supreme Court order in this matter.

### Costs

The court further recommends that costs be awarded to the State Bar in accordance with Business and Professions Code section 6086.10 and that such costs be enforceable both as provided in Business and Professions Code section 6140.7 and as a money judgment. Respondent must also reimburse the Client Security Fund to the extent that the misconduct in this matter results in the payment of funds, and such payment is enforceable as provided under Business and Professions Code section 6140.5.

## ORDER OF INVOLUNTARY INACTIVE ENROLLMENT

In accordance with Business and Professions Code section 6007, subdivision (c)(4), it is ordered that **Ronald White**, Member No. 85723, be involuntarily enrolled as an inactive member of the State Bar of California, effective three calendar days after service of this decision and order by mail. (Rules Proc. of State Bar, rule 5.111(D)(1).)[15]

Dated: June _____, 2014

DONALD F. MILES
Judge of the State Bar Court

---

[15] An inactive member of the State Bar of California cannot lawfully practice law in this state. (Bus. & Prof. Code, § 6126, subd. (b); see also Bus. & Prof. Code, § 6125.)  It is a crime for an attorney who has been enrolled inactive (or disbarred) to practice law, to attempt to practice law, or to even hold himself or herself out as entitled to practice law. (*Ibid.*)  Moreover, an attorney who has been enrolled inactive (or disbarred) may not lawfully represent others before any state agency or in any state administrative hearing even if laypersons are otherwise authorized to do so. (*Benninghoff v. Superior Court* (2006) 136 Cal.App.4th 61, 66-73.)

# ORIGINAL

(Do not write above this line.)

<table>
<tr>
<td colspan="2"><strong>PUBLIC MATTER</strong></td>
<td colspan="2"><strong>State Bar Court of California</strong><br>Hearing Department<br>Los Angeles<br>ACTUAL SUSPENSION</td>
</tr>
<tr>
<td colspan="2">Counsel For The State Bar<br><br>Mia R. Ellis<br>State Bar of California<br>1149 South Hill Street<br>Los Angeles, CA 90015<br><br>Bar # 228235</td>
<td>Case Number(s):<br>09-O-16750; 10-O-02585<br><br><br><strong>PUBLIC MATTER</strong></td>
<td>For Court use only<br><br><strong>FILED</strong><br><br>JUN 20 2011<br><br>STATE BAR COURT<br>CLERK'S OFFICE<br>LOS ANGELES<br><br>kwiktag ®   018 043 246</td>
</tr>
<tr>
<td colspan="2">In Pro Per Respondent<br><br>Ronald White<br>17625 S. Central Avenue, Suite D<br>Carson, CA 90746<br><br><br>Bar # 85723</td>
<td colspan="2">Submitted to:  <strong>Settlement Judge</strong><br><br>STIPULATION RE FACTS, CONCLUSIONS OF LAW AND DISPOSITION AND ORDER APPROVING</td>
</tr>
<tr>
<td colspan="2">In the Matter of:<br>Ronald White<br><br>Bar # 85723<br><br>A Member of the State Bar of California<br>(Respondent)</td>
<td colspan="2"><strong>ACTUAL SUSPENSION</strong><br><br>☐ PREVIOUS STIPULATION REJECTED</td>
</tr>
</table>

**Note:** All information required by this form and any additional information which cannot be provided in the space provided, must be set forth in an attachment to this stipulation under specific headings, e.g., "Facts," "Dismissals," "Conclusions of Law," "Supporting Authority," etc.

## A. Parties' Acknowledgments:

(1)  Respondent is a member of the State Bar of California, admitted May 31, 1979.

(2)  The parties agree to be bound by the factual stipulations contained herein even if conclusions of law or disposition are rejected or changed by the Supreme Court.

(3)  All investigations or proceedings listed by case number in the caption of this stipulation are entirely resolved by this stipulation and are deemed consolidated. Dismissed charge(s)/count(s) are listed under "Dismissals." The stipulation consists of 10 pages, not including the order.

(4)  A statement of acts or omissions acknowledged by Respondent as cause or causes for discipline is included under "Facts."

(Effective January 1, 2011)

Actual Suspension

1

(Do not write above this line.)

(5) Conclusions of law, drawn from and specifically referring to the facts are also included under "Conclusions of Law".

(6) The parties must include supporting authority for the recommended level of discipline under the heading "Supporting Authority."

(7) No more than 30 days prior to the filing of this stipulation, Respondent has been advised in writing of any pending investigation/proceeding not resolved by this stipulation, except for criminal investigations.

(8) Payment of Disciplinary Costs—Respondent acknowledges the provisions of Bus. & Prof. Code §§6086.10 & 6140.7. (Check one option only):

☒ Until costs are paid in full, Respondent will remain actually suspended from the practice of law unless relief is obtained per rule 5.130, Rules of Procedure.

☐ Costs are to be paid in equal amounts prior to February 1 for the following membership years: (Hardship, special circumstances or other good cause per rule 5.132, Rules of Procedure.) If Respondent fails to pay any installment as described above, or as may be modified by the State Bar Court, the remaining balance is due and payable immediately.

☐ Costs are waived in part as set forth in a separate attachment entitled "Partial Waiver of Costs".

☐ Costs are entirely waived.

## B. Aggravating Circumstances [for definition, see Standards for Attorney Sanctions for Professional Misconduct, standard 1.2(b)]. Facts supporting aggravating circumstances are required.

(1) ☒ **Prior record of discipline** [see standard 1.2(f)]

(a) ☒ State Bar Court case # of prior case 00-C-10007

(b) ☒ Date prior discipline effective April 4, 2002

(c) ☒ Rules of Professional Conduct/ State Bar Act violations: Business and Professinos Code section 6068(a)

(d) ☒ Degree of prior discipline one year stayed, two years probation, and ninety days actual

(e) ☐ If Respondent has two or more incidents of prior discipline, use space provided below.

(2) ☐ **Dishonesty:** Respondent's misconduct was surrounded by or followed by bad faith, dishonesty, concealment, overreaching or other violations of the State Bar Act or Rules of Professional Conduct.

(3) ☐ **Trust Violation:** Trust funds or property were involved and Respondent refused or was unable to account to the client or person who was the object of the misconduct for improper conduct toward said funds or property.

(4) ☐ **Harm:** Respondent's misconduct harmed significantly a client, the public or the administration of justice.

(5) ☐ **Indifference:** Respondent demonstrated indifference toward rectification of or atonement for the consequences of his or her misconduct.

(Do not write above this line.)

(6) ☐ **Lack of Cooperation:** Respondent displayed a lack of candor and cooperation to victims of his/her misconduct or to the State Bar during disciplinary investigation or proceedings.

(7) ☐ **Multiple/Pattern of Misconduct:** Respondent's current misconduct evidences multiple acts of wrongdoing or demonstrates a pattern of misconduct.

(8) ☐ **No aggravating circumstances** are involved.

**Additional aggravating circumstances:**

## C. Mitigating Circumstances [see standard 1.2(e)]. Facts supporting mitigating circumstances are required.

(1) ☐ **No Prior Discipline:** Respondent has no prior record of discipline over many years of practice coupled with present misconduct which is not deemed serious.

(2) ☐ **No Harm:** Respondent did not harm the client or person who was the object of the misconduct.

(3) ☒ **Candor/Cooperation:** Respondent displayed spontaneous candor and cooperation with the victims of his/her misconduct and to the State Bar during disciplinary investigation and proceedings. By stipulating to facts, conclusions of law and discipline, Respondent has been cooperative with the State Bar.

(4) ☐ **Remorse:** Respondent promptly took objective steps spontaneously demonstrating remorse and recognition of the wrongdoing, which steps were designed to timely atone for any consequences of his/her misconduct.

(5) ☐ **Restitution:** Respondent paid $         on         in restitution to         without the threat or force of disciplinary, civil or criminal proceedings.

(6) ☐ **Delay:** These disciplinary proceedings were excessively delayed. The delay is not attributable to Respondent and the delay prejudiced him/her.

(7) ☐ **Good Faith:** Respondent acted in good faith.

(8) ☐ **Emotional/Physical Difficulties:** At the time of the stipulated act or acts of professional misconduct Respondent suffered extreme emotional difficulties or physical disabilities which expert testimony would establish was directly responsible for the misconduct. The difficulties or disabilities were not the product of any illegal conduct by the member, such as illegal drug or substance abuse, and Respondent no longer suffers from such difficulties or disabilities.

(9) ☐ **Severe Financial Stress:** At the time of the misconduct, Respondent suffered from severe financial stress which resulted from circumstances not reasonably foreseeable or which were beyond his/her control and which were directly responsible for the misconduct.

(10) ☐ **Family Problems:** At the time of the misconduct, Respondent suffered extreme difficulties in his/her personal life which were other than emotional or physical in nature.

(11) ☐ **Good Character:** Respondent's good character is attested to by a wide range of references in the legal and general communities who are aware of the full extent of his/her misconduct.

(Do not write above this line.)

(12) ☐ **Rehabilitation:** Considerable time has passed since the acts of professional misconduct occurred followed by convincing proof of subsequent rehabilitation.

(13) ☐ **No mitigating circumstances** are involved.

**Additional mitigating circumstances:**

## D. Discipline:

(1) ☒ **Stayed Suspension:**

    (a) ☒ Respondent must be suspended from the practice of law for a period of one year.

        i. ☐ and until Respondent shows proof satisfactory to the State Bar Court of rehabilitation and present fitness to practice and present learning and ability in the law pursuant to standard 1.4(c)(ii) Standards for Attorney Sanctions for Professional Misconduct.

        ii. ☐ and until Respondent pays restitution as set forth in the Financial Conditions form attached to this stipulation.

        iii. ☐ and until Respondent does the following:

    (b) ☒ The above-referenced suspension is stayed.

(2) ☒ **Probation:**

    Respondent must be placed on probation for a period of two years, which will commence upon the effective date of the Supreme Court order in this matter.  (See rule 9.18, California Rules of Court)

(3) ☒ **Actual Suspension:**

    (a) ☒ Respondent must be actually suspended from the practice of law in the State of California for a period of ninety (90) days.

        i. ☐ and until Respondent shows proof satisfactory to the State Bar Court of rehabilitation and present fitness to practice and present learning and ability in the law pursuant to standard 1.4(c)(ii), Standards for Attorney Sanctions for Professional Misconduct

        ii. ☐ and until Respondent pays restitution as set forth in the Financial Conditions form attached to this stipulation.

        iii. ☐ and until Respondent does the following:

## E. Additional Conditions of Probation:

(1) ☐ If Respondent is actually suspended for two years or more, he/she must remain actually suspended until he/she proves to the State Bar Court his/her rehabilitation, fitness to practice, and learning and ability in the general law, pursuant to standard 1.4(c)(ii), Standards for Attorney Sanctions for Professional Misconduct.

(2) ☒ During the probation period, Respondent must comply with the provisions of the State Bar Act and Rules of Professional Conduct.

(Do not write above this line.)

(3) ☒ Within ten (10) days of any change, Respondent must report to the Membership Records Office of the State Bar and to the Office of Probation of the State Bar of California ("Office of Probation"), all changes of information, including current office address and telephone number, or other address for State Bar purposes, as prescribed by section 6002.1 of the Business and Professions Code.

(4) ☒ Within thirty (30) days from the effective date of discipline, Respondent must contact the Office of Probation and schedule a meeting with Respondent's assigned probation deputy to discuss these terms and conditions of probation. Upon the direction of the Office of Probation, Respondent must meet with the probation deputy either in-person or by telephone. During the period of probation, Respondent must promptly meet with the probation deputy as directed and upon request.

(5) ☒ Respondent must submit written quarterly reports to the Office of Probation on each January 10, April 10, July 10, and October 10 of the period of probation. Under penalty of perjury, Respondent must state whether Respondent has complied with the State Bar Act, the Rules of Professional Conduct, and all conditions of probation during the preceding calendar quarter. Respondent must also state whether there are any proceedings pending against him or her in the State Bar Court and if so, the case number and current status of that proceeding. If the first report would cover less than 30 days, that report must be submitted on the next quarter date, and cover the extended period.

In addition to all quarterly reports, a final report, containing the same information, is due no earlier than twenty (20) days before the last day of the period of probation and no later than the last day of probation.

(6) ☐ Respondent must be assigned a probation monitor. Respondent must promptly review the terms and conditions of probation with the probation monitor to establish a manner and schedule of compliance. During the period of probation, Respondent must furnish to the monitor such reports as may be requested, in addition to the quarterly reports required to be submitted to the Office of Probation. Respondent must cooperate fully with the probation monitor.

(7) ☒ Subject to assertion of applicable privileges, Respondent must answer fully, promptly and truthfully any inquiries of the Office of Probation and any probation monitor assigned under these conditions which are directed to Respondent personally or in writing relating to whether Respondent is complying or has complied with the probation conditions.

(8) ☒ Within one (1) year of the effective date of the discipline herein, Respondent must provide to the Office of Probation satisfactory proof of attendance at a session of the Ethics School, and passage of the test given at the end of that session.

☐ No Ethics School recommended. Reason:

(9) ☐ Respondent must comply with all conditions of probation imposed in the underlying criminal matter and must so declare under penalty of perjury in conjunction with any quarterly report to be filed with the Office of Probation.

(10) ☐ The following conditions are attached hereto and incorporated:

☐ Substance Abuse Conditions          ☐ Law Office Management Conditions

☐ Medical Conditions                  ☐ Financial Conditions

## F. Other Conditions Negotiated by the Parties:

(1) ☒ **Multistate Professional Responsibility Examination:** Respondent must provide proof of passage of the Multistate Professional Responsibility Examination ("MPRE"), administered by the National Conference of Bar Examiners, to the Office of Probation during the period of actual suspension or within one year, whichever period is longer. **Failure to pass the MPRE results in actual suspension without**

(Effective January 1, 2011)

Actual Suspension

(Do not write above this line.)

further hearing until passage. But see rule 9.10(b), California Rules of Court, and rule 5.162(A) & (E), Rules of Procedure.

☐ No MPRE recommended.  Reason:

(2)   ☒   **Rule 9.20, California Rules of Court:**  Respondent must comply with the requirements of rule **9.20**, California Rules of Court, and perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 calendar days, respectively, after the effective date of the Supreme Court's Order in this matter.

(3)   ☐   **Conditional Rule 9.20, California Rules of Court:**  If Respondent remains actually suspended for 90 days or more, he/she must comply with the requirements of rule **9.20**, California Rules of Court, and perform the acts specified in subdivisions (a) and (c) of that rule within 120 and 130 calendar days, respectively, after the effective date of the Supreme Court's Order in this matter.

(4)   ☐   **Credit for Interim Suspension [conviction referral cases only]:**  Respondent will be credited for the period of his/her interim suspension toward the stipulated period of actual suspension. Date of commencement of interim suspension:

(5)   ☐   **Other Conditions:**

## ATTACHMENT TO

## STIPULATION RE FACTS, CONCLUSIONS OF LAW AND DISPOSITION

IN THE MATTER OF:    Ronald White
CASE NUMBER(S):    09-O-16750, 10-O-02585

**FACTS AND CONCLUSIONS OF LAW.**

Respondent admits that the following facts are true and that he is culpable of violations of the specified statutes and/or Rules of Professional Conduct.

Case No. 09-O-16750 (Complainant: Deion Haggerty)

FACTS:

1.    In 2007, Respondent represented Deion Haggerty ("Haggerty") in a criminal trial.
2.    On June 28, 2009, Haggerty wrote Respondent requesting that Respondent release Haggerty's client file so that he may pursue a habeas corpus petition. On June 28, 2009, Haggerty properly mailed the letter to Respondent. The June 28, 2009 letter was not returned as undeliverable or for any other reason. Respondent did not respond to the letter and did not release the client file.
3.    On August 12, 2009, Haggerty wrote Respondent again requesting his file. On August 12, 2009, Haggerty properly mailed the letter to Respondent. The August 12, 2009 letter was not returned as undeliverable. Respondent did not respond to the letter and did not release the client file.
4.    On December 7, 2009, Respondent wrote the State Bar stating that he had not received the two letters from Haggerty.
5.    On April 20, 2010 and May 7, 2010, a State Bar investigator wrote Respondent and enclosed copies of Haggerty's June 28, 2009 and August 12, 2009 letters, including the proofs of service. The letters with the enclosures were properly mailed to Respondent at his official membership records address. Respondent received the investigator's letters with their enclosures, but Respondent did not promptly release the client file to Haggerty.
6.    In April 2010, Respondent spoke to Haggerty by telephone and Haggerty again asked for documents from his file. Respondent failed to timely provide any client documents to Haggerty.
7.    In December 2010, Respondent met with the State Bar, and Respondent was asked to release the client file to Haggerty.
8.    In December 2010, Respondent released the client file to Haggerty.

CONCLUSIONS OF LAW:

By not timely releasing the client file to Haggerty despite his requests, Respondent failed to release promptly, upon termination of employment, to the client, at the request of the client, all the client papers and property Respondent willfully violated Rules of Professional Conduct, rule 3-700(D)(1).

Case No. 10-O-02585 (Complainant: Christian Martinez)

FACTS:

1.    In February 2008, Christian Martinez ("Martinez") hired Respondent to represent Martinez in a criminal appeal. In February 2008, Respondent was paid $3,000 in advanced attorney's fees to

Attachment Page 7

pursue Martinez's criminal appeal before the California Court of Appeal, Second Appellate District, case no. B204770.

2. On April 7, 2008, Respondent substituted in as counsel for Martinez in the criminal appeal.

3. On June 4, 2008, the California Court of Appeal issued a notice regarding the failure to file the opening brief in Martinez's appeal.

4. On June 12, 2008, the California Court of Appeal issued a Notice of Default in Martinez's criminal appeal. The Notice of Default was properly served on Respondent. Respondent received notice of the default but did not notify Martinez that default had been entered in her appeal.

5. On June 16, 2008, Respondent filed a request for extension of time to file the opening brief and a request to set aside the default, which was granted on June 17, 2008.

6. On July 15, 2008, Respondent filed the opening brief in Martinez's appeal. Respondent did not inform Martinez that the opening brief had been filed in her criminal appeal.

7. On March 2, 2010, the California Court of Appeal issued an opinion in Martinez's criminal appeal modifying Martinez's sentence. Respondent was properly served with the opinion in the criminal appeal. Respondent received the opinion but did not inform Martinez that the opinion was issued and did not inform Martinez that her sentence had been altered.

8. On August 30, 2010, Martinez wrote Respondent asking him to provide the transcripts and other documents from her file. On or about August 30, 2010, Martinez properly mailed the letter to Respondent. Respondent received the letter but failed to respond and failed to release the client file to Martinez.

9. In February 2011, Respondent released the client file to Martinez's mother

10. On March 17, 2010, the State Bar opened an investigation, case no.

11. 10-O-02585, pursuant to a complaint made against Respondent regarding Christian Martinez (the "Martinez matter").

12. On April 5, 2010 and April 23, 2010, a State Bar investigator mailed letters to Respondent at his official membership records address regarding the Martinez matter. Respondent received the letters but failed to provide a response.

13. On May 12, 2010, Respondent contacted the State Bar investigator and requested an extension of time to provide a response, which was granted. Respondent failed to provide a response.

14. On November 24, 2010, Respondent telephoned the State Bar investigator and requested another copy of the April 5, 2010 letter regarding the Martinez matter. On or about November 29, 2010, the State Bar investigator faxed the April 5, 2010 letter to Respondent. Respondent receive the letter but did not provide a response

CONCLUSIONS OF LAW:

By failing to inform Martinez that default had been entered in her appeal, by failing to inform Martinez that he had filed an opening brief on her behalf and by failing to provide Martinez with the outcome of her appeal, Respondent failed to keep a client reasonably informed of significant developments in a matter in which Respondent had agreed to provide legal services Respondent willfully violated Business and Professions Code, section 6068(m).

By not timely releasing the client file to Martinez despite her request, Respondent failed to release promptly, upon termination of employment, to the client, at the request of the client, all the client papers and property Respondent willfully violated Rules of Professional Conduct, rule 3-700(D)(1).

By not providing a written response to the allegations in the Martinez matter or otherwise cooperating in the investigation of the Martinez matter, Respondent failed to cooperate and participate in a disciplinary

Attachment Page 8

investigation pending against Respondent, Respondent willfully violated Business and Professions Code, section 6068(i).

**PENDING PROCEEDINGS.**

The disclosure date referred to, on page 2, paragraph A(7), was May 12, 2011.

**AUTHORITIES SUPPORTING DISCIPLINE.**

The Supreme Court emphasized the importance of the Standards and held that great weight should be given to the application of the Standards in determining the appropriate level of discipline. The Court indicated that unless it has "grave doubts as to the propriety of the recommended discipline," it will uphold the application of the Standards. *In re Silverton* (2005) 36 Cal. 4th 81, 91-92.

Standard 1.3 provides that the primary purposes of attorney discipline are, "the protection of the public, the courts and the legal profession; the maintenance of high legal professional standards by attorneys and the preservation of public confidence in the legal profession."

Standard 1.7(a) The Standards for Attorney Sanctions for Professional Misconduct provide, as follows: If a member is found culpable of professional misconduct in any proceeding in which discipline may be imposed and the member has a record of one prior imposition of discipline as defined by standard 1.2(f), the degree of discipline imposed in the current proceeding shall be greater than that imposed in the prior proceeding unless the prior discipline imposed was so remote in time to the current proceeding and the offense for which it was imposed so minimal in severity that imposing greater discipline in the current proceeding would be manifestly unjust.

Standard 2.6 provides that culpability of a member of a violation of sections 6125 and 6126, 6103 of The Business and Professions Code shall result in disbarment or suspension depending on the gravity of the offense of the harm, if any, to the victim, with due regard to the purposes of imposing discipline set forth in standard 1.3.

Standard 2.10 provides culpability of a member of a violation of any provision of the Business and Professions Code not specified in these standards or a wilful violation of any Rule of Professional Conduct not specified in these standards shall result in reproval or suspension according to the gravity of the offense or the harm, if any, to the victim, with due regard to the purposes of imposing discipline set forth in Standard 1.3

Balancing the aggravating and mitigating factors and the facts of the case, the 90-day actual suspension recommended is appropriate.

**COSTS OF DISCIPLINARY PROCEEDINGS.**

Respondent acknowledges that the Office of the Chief Trial Counsel has informed respondent that as of May 12, 2011, the prosecution costs in this matter are $4371. Respondent further acknowledges that the cost is an estimate and should this stipulation be rejected or should relief from the stipulation be granted, the costs in this matter may increase due to the cost of further proceedings.

(Do not write above this line.)

| In the Matter of:<br>Ronald White | Case number(s):<br>09-O-16750; 10-O-02585 |
|---|---|

## SIGNATURE OF THE PARTIES

By their signatures below, the parties and their counsel, as applicable, signify their agreement with each of the recitations and each of the terms and conditions of this Stipulation Re Facts, Conclusions of Law, and Disposition.

| 6-3-11 | _Ronald White_ | Ronald White |
|---|---|---|
| Date | Respondent's Signature | Print Name |

| | | |
|---|---|---|
| Date | Respondent's Counsel Signature | Print Name |

| 6/7/11 | _Mia R. Ellis_ | Mia Ellis |
|---|---|---|
| Date | Deputy Trial Counsel's Signature | Print Name |

(Effective January 1, 2011)

**Page _10_**

Signature Page

(Do not write above this line.)

| In the Matter of: | Case Number(s): |
|---|---|
| RONALD WHITE | 09-O-16750; 10-O-02585 |

### ACTUAL SUSPENSION ORDER

Finding the stipulation to be fair to the parties and that it adequately protects the public, IT IS ORDERED that the requested dismissal of counts/charges, if any, is GRANTED without prejudice, and:

☐ The stipulated facts and disposition are APPROVED and the DISCIPLINE RECOMMENDED to the Supreme Court.

☒ The stipulated facts and disposition are APPROVED AS MODIFIED as set forth below, and the DISCIPLINE IS RECOMMENDED to the Supreme Court.

☐ All Hearing dates are vacated.

*PAGE 2 - B. (1) (6) — DELETE "APRIL 4, 2002"*
*Add — April 3, 2002"*

The parties are bound by the stipulation as approved unless: 1) a motion to withdraw or modify the stipulation, filed within 15 days after service of this order, is granted; or 2) this court modifies or further modifies the approved stipulation. (See rule 5.58(E) & (F), Rules of Procedure.) **The effective date of this disposition is the effective date of the Supreme Court order herein, normally 30 days after file date. (See rule 9.18(a), California Rules of Court.)**

Date _____06-30-11_____

_____
**RICHARD A. PLATEL**
Judge of the State Bar Court

### RICHARD A. PLATEL

## CERTIFICATE OF SERVICE

[Rules Proc. of State Bar; Rule 5.27(B); Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court of California. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of Los Angeles, on June 20, 2011, I deposited a true copy of the following document(s):

    STIPULATION RE FACTS, CONCLUSIONS OF LAW AND DISPOSITION AND ORDER APPROVING

in a sealed envelope for collection and mailing on that date as follows:

☒     by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at Los Angeles, California, addressed as follows:

        RONALD WHITE
        ATTORNEY AT LAW
        17625 S CENTRAL AVE STE D
        CARSON, CA 90746

☐     by certified mail, No.    , with return receipt requested, through the United States Postal Service at    , California, addressed as follows:

☐     by overnight mail at    , California, addressed as follows:

☐     by fax transmission, at fax number    . No error was reported by the fax machine that I used.

☐     By personal service by leaving the documents in a sealed envelope or package clearly labeled to identify the attorney being served with a receptionist or a person having charge of the attorney's office, addressed as follows:

☒     by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

        Mia R. Ellis, Enforcement, Los Angeles

I hereby certify that the foregoing is true and correct. Executed in Los Angeles, California, on June 20, 2011.

                           Cristina Potter
                           Case Administrator
                           State Bar Court

FILED

JAN 05 2012

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

STATE BAR COURT OF CALIFORNIA

HEARING DEPARTMENT - LOS ANGELES

| | |
|---|---|
| In the Matter of | ) Case No.: **09-O-16750; [10-O-02585]** |
| | ) **[S95665]** |
| **RONALD WHITE,** | ) **ORDER DENYING RESPONDENT'S** |
| | ) **MOTION FOR RELIEF FROM COSTS;** |
| Member No. 85723, | ) **ORDER GRANTING MOTION FOR** |
| | ) **EXTENSION TO PAY COSTS** |
| A Member of the State Bar. | ) |

On December 21, 2011, respondent Ronald White, filed a motion for relief from costs, or
in the alternative, an extension in time to pay costs.  The State Bar of California ("State Bar")
filed a response in partial opposition on December 27, 2011.  Respondent is representing himself
in this matter.  The State Bar is represented by Assistant Chief Trial Counsel Dane C. Dauphine

After a careful review of the motion and response, the court **DENIES** the motion for
relief of costs, no good cause having been shown.  The court **GRANTS** the motion for extension
of time to pay costs, good cause having been shown.  Accordingly, the time to pay costs is
extended, costs to be paid in equal amounts for billing years 2013 and 2014.

**IT IS SO ORDERED.**

Dated:  January 3, 2012.

**RICHARD A. PLATEL**
Judge of the State Bar Court

kwiktag ®         018 043 752

## CERTIFICATE OF SERVICE

[Rules Proc. of State Bar; Rule 5.27(B); Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court of California. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of Los Angeles, on January 5, 2012, I deposited a true copy of the following document(s):
**ORDER DENYING RESPONDENT'S MOTION FOR RELIEF FROM COSTS; ORDER GRANTING MOTION FOR EXTENSION TO PAY COSTS**

in a sealed envelope for collection and mailing on that date as follows:

☒    by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at Los Angeles, California, addressed as follows:

     RONALD WHITE
     ATTORNEY AT LAW
     17625 S CENTRAL AVE STE D
     CARSON, CA 90746

☒    by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

         DANE DAUPHINE, Enforcement, Los Angeles

I hereby certify that the foregoing is true and correct. Executed in Los Angeles, California, on January 5, 2012.

           Johnnie Lee Smith
           Case Administrator
           State Bar Court

# EXHIBIT COVER PAGE

EXHIBIT

Description of this Exhibit: Department of Health Services
County of Los Angeles:
Trauma Triage.

Number of pages to this Exhibit: 4 pages.

JURISDICTION:  (Check only one)

- [ ] Municipal Court
- [ ] Superior Court
- [ ] Appellate Court
- [ ] State Supreme Court
- [x] United States District Court
- [ ] State Circuit Court
- [ ] United States Supreme Court
- [ ] Grand Jury

DEPARTMENT OF HEALTH SERVICES
COUNTY OF LOS ANGELES

(EMT, PARAMEDIC, MICN)

SUBJECT:    **TRAUMA TRIAGE**                                    REFERENCE NO. 506

PURPOSE:    To establish criteria and standards which ensure that patients requiring the care of a trauma center are appropriately triaged and transported.

AUTHORITY:  California Code of Regulations, Title 13, Section 1105(c) California Code of Regulations, Title 22, Section 100236 et seq. Health and Safety Code, Div. 2.5, Section 1797 et seq., and 1317.

PRINCIPLES:

1.    Trauma patients should be secured and transported from the scene as quickly as possible, consistent with optimal trauma care.

2.    An emergency patient should be transported to the most accessible medical facility appropriate to their needs.  The base hospital physician's determination in this regard is controlling.

3.    Paramedics shall make base hospital contact or Standing Field Treatment Protocol (SFTP) notification for approved provider agencies with the designated trauma center, when it is also a base hospital, on all injured patients who meet Base Contact and Transport Criteria (Prehospital Care Policy, Ref. No. 808), trauma triage criteria and/or guidelines, or if in the paramedic's judgment it is in the patient's best interest to be transported to a trauma center.  Contact shall be accomplished in such a way as not to delay transport.

4.    Do not delay transport of hypotensive patients with penetrating torso trauma in order to apply spinal immobilization.

5.    EMT personnel may immediately transport hypotensive patients with life-threatening, penetrating injuries to the torso to the closest trauma center, not the Most Accessible Receiving (MAR), when the transport time is less than the estimated time of paramedic arrival.  The transporting unit should make every effort to contact the receiving trauma center.

6.    When pediatric and adult trauma patients are transported together in on aircraft, the receiving trauma center shall also be a pediatric trauma center.

7.    Patients in blunt traumatic full arrest, not meeting Reference No. 814, should be transported to the most accessible medical facility appropriate to their needs.

POLICY:

I.    Trauma Criteria — Requires immediate transportation to a designated trauma center

EFFECTIVE DATE: 6-15-87                                    PAGE 1 OF 4
REVISED: 12-01-14
SUPERSEDES: 07-01-14

APPROVED: _____        _____
                  Director, EMS Agency                        Medical Director, EMS Agency

SUBJECT:   **TRAUMA TRIAGE**                    REFERENCE NO. 506

Patients who fall into one or more of the following categories are to be transported directly to the designated trauma center, if transport time does not exceed 30 minutes.

A.   Systolic blood pressure less than 90 mmHg, or less than 70 mmHg in infants age less than one year.

B.   Respiratory rate greater than 29 breaths/minute (sustained), less than 10 breaths/minute, less than 20 breaths/minute in infants age less than one year, or requiring ventilatory support

C.   Cardiopulmonary arrest with penetrating torso trauma unless based upon the paramedic's thorough assessment is found apneic, pulseless, asystolic, and without pupillary reflexes upon arrival of EMS personnel at the scene.

D.   All penetrating injuries to head, neck, torso, and extremities proximal to the elbow or knee

E.   Blunt head injury associated with a suspected skull fracture, altered level of consciousness (GCS less than or equal to 14), seizures, unequal pupils, or focal neurological deficit

F.   Injury to the spinal column associated with acute sensory or motor deficit

G.   Blunt injury to chest with unstable chest wall (flail chest)

H.   Diffuse abdominal tenderness

I.   Suspected pelvic fracture (excluding isolated hip fracture from a ground level fall)

J.   Extremity injuries with:
    i.   Neurological/vascular compromise and/or crushed, degloved, or mangled extremity
    ii.  Amputation proximal to the wrist or ankle
    iii  Fractures of two or more proximal (humerus/femur) long-bones

K.   Falls:
    i.   Adult patients from heights greater than 15 feet
    ii.  Pediatric patients from heights greater than 10 feet, or greater than 3 times the height of the child

L.   Passenger space intrusion of greater than 12 inches into an occupied passenger space

M.   Ejected from vehicles (partial or complete)

N.   Auto versus pedestrian/bicyclist/motorcyclist thrown, run over, or with significant (greater than 20 mph) impact

O.   Unenclosed transport crash with significant (greater than 20 mph) impact

SUBJECT:   **TRAUMA TRIAGE**                    REFERENCE NO. 506

II.     Trauma Guidelines – Mechanism of injury and patient history are the most effective methods of selecting critically injured patients before unstable vital signs develop. Paramedics and base hospital personnel should consider mechanism of injury and patient history when determining patient destination.  At the discretion of the base hospital or approved SFTP provider agency, transportation to a trauma center is advisable for:

   A.     Passenger space intrusion of greater than 18 inches into any unoccupied passenger space

   B.     Automobile versus pedestrian/bicyclist/motorcyclist (impact equal to or less than 20 mph)

   C.     Injured victims of vehicular crashes in which a fatality occurred in the same vehicle

   D.     Patients requiring extrication

   D.     Vehicle telemetry data consistent with high risk of injury

   E.     Injured patients (excluding isolated minor extremity injuries):
          i.     on anticoagulation therapy other than aspirin-only
          ii.    with bleeding disorders

III.    Special Considerations – Consider transporting injured patients with the following to a trauma center:

   A.     Adults age greater than 55 years

   B.     Systolic blood pressure less than 110 mmHg may represent shock after age 65 years

   C.     Pregnancy greater than 20 weeks gestation

   D.     Prehospital judgment

IV.     Extremis Patients - Requires immediate transportation to the MAR:

   A.     Patients with an obstructed airway

   B.     Patients, as determined by the base hospital personnel, whose lives would be jeopardized by transportation to any destination but the MAR

V.      When, for whatever reason, base hospital contact cannot be made, the destination decision for injured patients will be made by paramedics using the principles set forth above.

SUBJECT:   **TRAUMA TRIAGE**                    REFERENCE NO. 506

CROSS REFERENCE:

Prehospital Care Manual:
Ref. No. 501, **Hospital Directory**
Ref. No. 502, **Patient Destination**
Ref. No. 503, **Guidelines for Hospitals Requesting Diversion of ALS Units**
Ref. No. 504, **Trauma Patient Destination**
Ref. No. 808, **Base Hospital Contact and Transport Criteria**
Ref. No. 814, **Determination/Pronouncement of Death in the Field**

# EXHIBIT COVER PAGE

| E |
|---|
| **EXHIBIT** |

Description of this Exhibit: LAPD Incident Report

Number of pages to this Exhibit: 2 pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☑ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

On Thursday February 25, 2010 at approximately 0220 hours my partner, Officer M. Lanza #38140 and I, Officer R. Campos #33975 were assigned to Southeast Division, working 18A3. We were working in full police uniform and driving a clearly marked black and white police vehicle. I was the driver and my partner was the passenger. We were in the area of 102nd Street and Avalon Boulevard when we observed the following;

We were traveling northbound Avalon Boulevard approaching 102nd Street, when we observed a newer model sport-utility vehicle traveling southbound Avalon Boulevard at a high rated speed, in a clear violation of California Vehicle Code Section 22350. As the vehicle came within 30-35 feet north of 102nd Street, he observed our vehicle and immediately reduced his speed. The driver then hesitated a bit and quickly negotiated a right-westbound turn onto 102nd Street. In an attempt to investigate the aforementioned violation, we also negotiated a westbound turn and positioned ourselves directly behind the vehicle, later identified as California #6EOF990.

The vehicles MDC check returned back to a 2000, GMC sport-utility vehicle and registered owner information of; King, Latonya, 9234 Avalon Boulevard #4 Los Angeles, California. We proceeded to activate our overhead emergency equipment in an attempt to conduct a traffic stop. The driver,                    immediately activated his right-hand turn signal and navigated the vehicle to the north curb of 102nd Street just east of Towne Avenue. Before we could voice our location and exit our vehicle, the driver quickly accelerated and continued westbound 102nd Street. We proceeded to follow the vehicle and were "initially" unable to voice the drivers' actions or direction of travel, due to Communications Division broadcasting at the same time. The vehicle continued westbound 102nd Street, at speeds well over "80-90 mph" as he raced through numerous "residential" areas. The driver continued westbound 102nd Street, passing San Pedro Avenue, Main Street and Broadway Avenue. Due to the driver's high rated speed and TOTAL disregard for pedestrian'(s), vehicle'(s), and his own safety, we lost vehicle after it drove west of San Pedro. At this point, we could only observe the vehicles taillights in the distance and could not give an exact location. After the radio cleared, we broadcasted the vehicles description and last known direction of travel.

Approximately 2-3 minutes after we lost the vehicle, we heard unit-18FB46; Officer J. Garcia broadcast an ADW Shooting, located at 92nd Street and Avalon Boulevard. Officer Garcia requested a Rescue Ambulance for a Victim of a gunshot wound. Having prior knowledge of the above vehicles, Registered Owners address, we responded to 18FB46 location to ascertain if it was related to our incident. Upon our arrival, we observed a male Black on the southeast corner of 92nd Street and Avalon Boulevard. The male Black later identified as Victim appeared to have sustained a gunshot wound to his head area and was unconscious and not breathing. Furthermore, while at scene I observed a female Black standing near the Victim. I asked the female if she knew or was related to the Victim. She answered, "No," and stated that she heard the gunshots and exited her apartment to see what had occurred. The female, later identified as Latonya, King (the Registered Owner of the above vehicle) stated that she lives at 9234 Avalon Boulevard #4. I asked Ms King if she owned a GMC Utility Vehicle, to which she stated "Yes." Ms King further added that her "boyfriend," later identified as Holmes, Charles Jr. had borrowed her vehicle. She also stated that he had gone to a "cease fire" meeting somewhere on the Westside. When asked why he was attending such a meeting, she stated, "Because he just got out of prison 6-8 months ago after doing 13 years for Robbery. "He is a 59 East Coast Crip and goes by the moniker of Slim."

I immediately relayed this information to Sergeant Bennett and quickly formed a tactical plan to search Ms Kings apartment after receiving consent. A search for a possible

Suspect'(s), and or any evidence ended with negative results.  Approximately 15-20 minutes after our incident, the above vehicle was located on the northwest corner of 102nd Street and Broadway Avenue. It was obvious and we "concluded" that the vehicle had driven clearly across the center island that divides southbound/northbound traffic on Broadway and collided with a wrought iron gate.  The vehicle finally came to rest as it struck a large pile of demolished wood and concrete.

Holmes-421

# EXHIBIT COVER PAGE

F

EXHIBIT

Description of this Exhibit: Photo of Petitioner's back at the time of Arrest

Number of pages to this Exhibit: 1 pages.

JURISDICTION: (Check only one)

☐ Municipal Court

☐ Superior Court

☐ Appellate Court

☐ State Supreme Court

☑ United States District Court

☐ State Circuit Court

☐ United States Supreme Court

☐ Grand Jury



Holmes-502

# EXHIBIT COVER PAGE

G

EXHIBIT

Description of this Exhibit: CHP Traffic Collision Report

Number of pages to this Exhibit: 5 pages.

JURISDICTION: (Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Appellate Court |
| ☐ | State Supreme Court |
| ☑ | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Supreme Court |
| ☐ | Grand Jury |

MISSING MS NOTES

STATE OF CALIFORNIA
# TRAFFIC COLLISION REPORT
CHP 555 Page 1 (Rev. 11-08) OPI 065

INC#10025000377

Page 1 of 5

| SPECIAL CONDITIONS | NUMBER INJURED | HIT & RUN FELONY ☑ | CITY | JUDICIAL DISTRICT | LOCAL REPORT NUMBER |
|---|---|---|---|---|---|
| | NUMBER KILLED | HIT & RUN MISDEMEANOR ☑ | Los Angeles | Los Angeles | 10-1807093 |

**CITY** Los Angeles
**COUNTY** Los Angeles
**REPORTING DISTRICT** 1805
**BEAT** 18T23
**DAY OF WEEK** S M T W ⊘F S
**TOW AWAY** ☒ YES ☐ NO

## LOCATION
COLLISION OCCURRED ON: 102 ND ST.

MO. 02 DAY 25 YEAR 2010 TIME(2400) 0330 NCIC# 1942 OFFICER I.D. 39317

MILEPOST INFORMATION / GPS COORDINATES
FEET/MILES OF / LATITUDE / LONGITUDE
PHOTOGRAPHS BY: OFCR GORDILO #36571

☐ AT INTERSECTION WITH
☒ OR: ☐ FEET/MILES W of BROADWAY
STATE HWY REL ☐ YES ☒ NO

### PARTY 1
DRIVER ☒ / PEDESTRIAN / PARKED VEHICLE / BICYCLIST / OTHER

DRIVER'S LICENSE NUMBER / STATE / CLASS / AIR BAG / SAFETY EQUIP.
VEH. YEAR 2000 MAKE/MODEL/COLOR GMC Yukon GREY LICENSE NUMBER 6EOF990 STATE CA

NAME (FIRST, MIDDLE, LAST):
OWNER'S NAME ☐ SAME AS DRIVER: KING LATONYA
STREET ADDRESS:
OWNER'S ADDRESS ☐ SAME AS DRIVER:
CITY/STATE/ZIP:
DISPOSITION OF VEHICLE ON ORDERS OF: ☑ OFFICER ☐ DRIVER ☐ OTHER OPG TON

SEX / HAIR / EYES / HEIGHT / WEIGHT / BIRTHDATE Mo. Day Year / RACE
PRIOR MECHANICAL DEFECTS: ☑ NONE APPARENT ☐ REFER TO NARRATIVE

HOME PHONE / BUSINESS PHONE
VEHICLE IDENTIFICATION NUMBER:

INSURANCE CARRIER / POLICY NUMBER
VEHICLE TYPE / DESCRIBE VEHICLE DAMAGE ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☑ MAJOR ☐ ROLL-OVER / SHADE IN DAMAGED AREA

DIR OF TRAVEL N ON STREET OR HIGHWAY BROADWAY SPEED LIMIT 35
CA / CAL-T / TCP/PSC / DOT / MC/MX

### PARTY 2
DRIVER'S LICENSE NUMBER / STATE / CLASS / AIR BAG / SAFETY EQUIP. / VEH. YEAR / MAKE/MODEL/COLOR / LICENSE NUMBER / STATE

NAME (FIRST, MIDDLE, LAST):
OWNER'S NAME ☐ SAME AS DRIVER
STREET ADDRESS:
OWNER'S ADDRESS ☐ SAME AS DRIVER
CITY/STATE/ZIP:
DISPOSITION OF VEHICLE ON ORDERS OF: ☐ OFFICER ☐ DRIVER ☐ OTHER

SEX / HAIR / EYES / HEIGHT / WEIGHT / BIRTHDATE / RACE
PRIOR MECHANICAL DEFECTS: ☐ NONE APPARENT ☐ REFER TO NARRATIVE

HOME PHONE / BUSINESS PHONE
VEHICLE IDENTIFICATION NUMBER:

INSURANCE CARRIER / POLICY NUMBER
VEHICLE TYPE / DESCRIBE VEHICLE DAMAGE ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☐ MAJOR ☐ ROLL-OVER

DIR OF TRAVEL / ON STREET OR HIGHWAY / SPEED LIMIT
CA / CAL-T / TCP/PSC / DOT / MC/MX

### PARTY 3
DRIVER'S LICENSE NUMBER / STATE / CLASS / AIR BAG / SAFETY EQUIP. / VEH. YEAR / MAKE/MODEL/COLOR / LICENSE NUMBER / STATE

NAME (FIRST, MIDDLE, LAST):
OWNER'S NAME ☐ SAME AS DRIVER
STREET ADDRESS:
OWNER'S ADDRESS ☐ SAME AS DRIVER
CITY/STATE/ZIP:
DISPOSITION OF VEHICLE ON ORDERS OF: ☐ OFFICER ☐ DRIVER ☐ OTHER

SEX / HAIR / EYES / HEIGHT / WEIGHT / BIRTHDATE / RACE
PRIOR MECHANICAL DEFECTS: ☐ NONE APPARENT ☐ REFER TO NARRATIVE

HOME PHONE / BUSINESS PHONE
VEHICLE IDENTIFICATION NUMBER:

INSURANCE CARRIER / POLICY NUMBER
VEHICLE TYPE / DESCRIBE VEHICLE DAMAGE ☐ UNK. ☐ NONE ☐ MINOR ☐ MOD. ☐ MAJOR ☐ ROLL-OVER

DIR OF TRAVEL / ON STREET OR HIGHWAY / SPEED LIMIT
CA / CAL-T / TCP/PSC / DOT / MC/MX

PREPARER'S NAME: 11/ANG 1 #39317
DISPATCH NOTIFIED ☐ YES ☐ NO ☒ N/A
REVIEWER'S NAME:
DATE REVIEWED:
Holmes-296

STATE OF CALIFORNIA
# TRAFFIC COLLISION CODING
CHP 555 Page 2 (Rev. 7-03) OPI 065

Page 2 of 5

| DATE OF COLLISION (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02-25-2010 | 0330 | 1942 | 39317 | 10-18- |

**PROPERTY DAMAGE**

OWNER'S NAME: ANDERSON, DAVID
OWNER'S ADDRESS: ▓▓▓▓▓▓▓ NOTIFIED ☒ YES ☐

DESCRIPTION OF DAMAGE: BLACK IRON FENCE BENT, DEBRIS PILE

## SEATING POSITION

```
  1 2 3
  4 5 6
    7
```
1 - DRIVER
2 TO 6 - PASSENGERS
7 - STATION WAGON REAR
8 - REAR OCC. TRK. OR VAN
9 - POSITION UNKNOWN
0 - OTHER

## OCCUPANTS
A - NONE IN VEHICLE
B - UNKNOWN
C - LAP BELT USED
D - LAP BELT NOT USED
E - SHOULDER HARNESS USED
F - SHOULDER HARNESS NOT USED
G - LAP/SHOULDER HARNESS USED
H - LAP/SHOULDER HARNESS NOT USED
J - PASSIVE RESTRAINT USED
K - PASSIVE RESTRAINT NOT USED

## SAFETY EQUIPMENT
L - AIR BAG DEPLOYED
M - AIR BAG NOT DEPLOYED
N - OTHER
P - NOT REQUIRED

## CHILD RESTRAINT
Q - IN VEHICLE USED
R - IN VEHICLE NOT USED
S - IN VEHICLE USE UNKNOWN
T - IN VEHICLE IMPROPER USE

## M / C BICYCLE - HELMET
DRIVER PASSENGER
V - NO X - NO
W - YES Y - YES

## EJECTED FROM VEHICLE
0 - NOT EJECTED
1 - FULLY EJECTED
2 - PARTIALLY EJECTED
3 - UNKNOWN

## INATTENTION CODES
A - CELLPHONE HANDHELD
B - CELLPHONE HANDSFREE
C - ELECTRONIC EQUIPMENT
D - RADIO / CD
E - SMOKING
F - EATING
G - CHILDREN
H - ANIMALS
J - PERSONAL HYGIENE
J - READING
K - OTHER

**ITEMS MARKED BELOW FOLLOWED BY AN ASTERISK (*) SHOULD BE EXPLAINED IN THE NARRATIVE.**

| PRIMARY COLLISION FACTOR | TRAFFIC CONTROL DEVICES | 1 | 2 | 3 | SPECIAL INFORMATION | 1 | 2 | 3 | MOVEMENT PRECEDING COLLISION |
|---|---|---|---|---|---|---|---|---|---|
| A ☒ VC SECTION VIOLATED 22350 CVC ☐ YES | A CONTROLS FUNCTIONING | | | | A HAZARDOUS MATERIAL | | | | A STOPPED |
| | B CONTROLS NOT FUNCTIONING* | | | | B CELL PHONE HANDHELD IN USE | | | | B PROCEEDING STRAIGHT |
| B OTHER IMPROPER DRIVING* | C CONTROLS OBSCURED | | | | C CELL PHONE HANDSFREE IN USE | | | | C RAN OFF ROAD |
| | D ☒ NO CONTROLS PRESENT / FACTOR* | | | | D CELL PHONE NOT IN USE | | | | D MAKING RIGHT TURN |
| C OTHER THAN DRIVER* | **TYPE OF COLLISION** | | | | E SCHOOL BUS RELATED | ✗ | | | E MAKING LEFT TURN |
| D UNKNOWN* | A HEAD-ON | | | | F 75 FT MOTORTRUCK COMBO | | | | F MAKING U TURN |
| | B SIDE SWIPE | | | | G 32 FT TRAILER COMBO | | | | G BACKING |
| | C REAR END | ✗ | | | H CELL UNK | | | | H SLOWING / STOPPING |
| | D BROADSIDE | | | | J | | | | I PASSING OTHER VEHICLE |
| **WEATHER (MARK 1 TO 2 ITEMS)** | E ☒ HIT OBJECT* | | | | K | | | | J CHANGING LANES |
| A ☒ CLEAR | F OVERTURNED | | | | L | | | | K PARKING MANEUVER |
| B CLOUDY | G VEHICLE / PEDESTRIAN | | | | M | | | | L ENTERING TRAFFIC |
| C RAINING | H OTHER* | | | | N | | | | M OTHER UNSAFE TURNING |
| D SNOWING | | | | | O | | | | N XING INTO OPPOSING LANE |
| FOG / VISIBILITY ___ FT | **MOTOR VEHICLE INVOLVED WITH** | | | | | | | | O PARKED |
| OTHER* | A NON - COLLISION | | | | | | | | P MERGING |
| WIND | B PEDESTRIAN | | | | | | | | Q TRAVELING WRONG WAY |
| **LIGHTING** | C OTHER MOTOR VEHICLE | 1 | 2 | 3 | **OTHER ASSOCIATED FACTOR(S) (MARK 1 TO 2 ITEMS)** | | | | R OTHER* |
| A DAYLIGHT | D MOTOR VEHICLE ON OTHER ROADWAY | | | | A VC SECTION VIOLATION ☐ CITED ☐ YES ☐ NO | | | | |
| B DUSK - DAWN | E PARKED MOTOR VEHICLE | | | | | | | | |
| C ☒ DARK - STREET LIGHTS | F TRAIN | | | | B VC SECTION VIOLATION ☐ CITED ☐ YES ☐ NO | | | | |
| D DARK - NO STREET LIGHTS | G BICYCLE | | | | | | | | |
| E DARK - STREET LIGHTS NOT FUNCTIONING* | H ANIMAL* | | | | C VC SECTION VIOLATION ☐ CITED ☐ YES ☐ NO | 1 | 2 | 3 | **SOBRIETY - DRUG PHYSICAL (MARK 1 TO 2 ITEMS)** |
| **ROADWAY SURFACE** | | | | | D | | | | A HAD NOT BEEN DRINKING |
| A DRY | I FIXED OBJECT: BUS BENCH | ✗ | | | E VISION OBSCUREMENT: | | | | B HBD - UNDER INFLUENCE |
| B ☒ WET | | | | | F INATTENTION* | | | | C HBD - NOT UNDER INFLUENCE* |
| C SNOWY - ICY | J OTHER OBJECT: BLACK IRON FENCE/DEBRIS | ✗ | | | G STOP & GO TRAFFIC | | | | D HBD - IMPAIRMENT UNKNOWN* |
| D SLIPPERY (MUDDY, OILY, ETC.) | | | | | H ENTERING / LEAVING RAMP | | | | E UNDER DRUG INFLUENCE* |
| **ROADWAY CONDITION(S) (MARK 1 TO 2 ITEMS)** | **PEDESTRIAN'S ACTIONS** | | | | I PREVIOUS COLLISION | | | | F IMPAIRMENT - PHYSICAL* |
| A HOLES, DEEP RUT* | A ☒ NO PEDESTRIANS INVOLVED | | | | J UNFAMILIAR WITH ROAD | ✗ | | | G IMPAIRMENT NOT KNOWN |
| B LOOSE MATERIAL ON ROADWAY* | B CROSSING IN CROSSWALK - AT INTERSECTION | | | | K DEFECTIVE VEH. EQUIP.: ☐ CITED ☐ YES ☐ NO | | | | H NOT APPLICABLE |
| C OBSTRUCTION ON ROADWAY* | | | | | | | | | I SLEEPY / FATIGUED* |
| D CONSTRUCTION - REPAIR ZONE | C CROSSING IN CROSSWALK - NOT AT INTERSECTION | | | | | | | | |
| E REDUCED ROADWAY WIDTH | D CROSSING - NOT IN CROSSWALK | | | | L UNINVOLVED VEHICLE | | | | |
| F FLOODED* | E IN ROAD - INCLUDES SHOULDER | | | | M OTHER* | | | | |
| G OTHER* | F NOT IN ROAD | ✗ | | | N NONE APPARENT | | | | |
| H ☒ NO UNUSUAL CONDITIONS | G APPROACHING / LEAVING SCHOOL BUS | | | | O RUNAWAY VEHICLE | | | | |

**SKETCH**



BROADWAY

INDICATE NORTH →

1
2
ST.

CURB

MISCELLANEOUS

PARTNER:
GORDILLO, R
# 36571

Holmes, 297

STATE OF CALIFORNIA
NARRATIVE/SUPPLEMENTAL                                        PAGE 3 OF 5

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 2-25-10 | 0330 | 1942 | 36571 | 10-18-07093 |

___ Information Received Telephonically.   ___ No at-scene investigation. All information received from _____.

**Collision Summary:**
V-1 NIB BROADWAY NEGOTIATED LT TURN TO WIB 102ND ST. V-1 ROR AND COLLIDED W/B BUS BENCH. V-1 CONT'D IN N/W DIRECTION COLLIDING WITH GATE AND THEN DEBRIS.

**Area(s) of Impact:** ___ Estimated  ___ Paced  X Measured:  GORDILLO / WONG   N/W/C.

AOI #1: 38 Feet (N) S E W of the (N) S E W curb of 102ND ST                                    &
O Feet N S E (W) of the N S E (W) curb of BROADWAY        V-1 VS CURB
AOI #2: 38 Feet (N) S E W of the (N) S E W curb of 102ND ST                                  &
3 Feet N S E (W) of the N S E (W) curb of BROADWAY        V-1 VS BUS BENCH.
AOI #3: 45 Feet (N) S E W of the (N) S E W curb of 102ND ST                                &
15 Feet N S E (W) of the N S E (W) curb of BROADWAY        V-1 VS GATE
                                      SEE ADDTL FOR AOI #4.

AOI(s) Determined by: ___ Statements   X Physical Evidence

**Upon arrival:**
___ Citizen call  X Radio Call  ___ Observations
Received Call: _____ At Scene: _____ Incident Number: 100225 00 0377

**Controls:**
X Not a factor.
___ Tri-light signal(s)   Working Properly: ___ Yes  ___ No
___ Stop sign(s): Upright ___ Yes ___ No  Clearly visible: ___ Yes ___ No
___ Lane Markings (Describe): _____
___ Other: _____

**Physical Evidence:**
___ None
X Type: V-1 LEFT AT SCENE, DAMAGE TO PROPERTY.

**Remarks:**
4.37 Information was exchanged. ___ Yes X No (If no, explain in "Additional.")
Crime Information: X P-1, Driving V-1, Failed to stop and ID self or otherwise comply with 20002(a) VC.
___ P-1, Driving V-1, Failed to stop and ID self and render aid to injured person(s), or comply with 20001(a) VC.
___ P-___ Displayed the objective symptoms of DUI and was arrested for 23152(a) VC BK#_____
Claims of mechanical failure: ___ Yes ___ No X N/A Type: _____

| PREPARER'S NAME | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE | |
|---|---|---|---|---|---|
| GORDILLO | 36571 | 2-25-10 | | 2/28/10 | Holmes-298 |

STATE OF CALIFORNIA
NARRATIVE/SUPPLEMENTAL                                    PAGE 4 OF 5

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 2-25-10 | 0330 | 1942 | 31671 | 10-18 |

X Additional Property damage: CITY OF L.A. STREET MAINT. DAMAGED BUS BENCH

Statements:

P-1 /V-1 GOA.

NO WITS TO THE T/C AT TIME OF INVESTIGATION.

AOI #4   VEH   VS   DEBRIS

46FT WEST OF WEST CURB OF BROADWAY
48FT NORTH OF NORTH CURB OF 102nd ST.

Additional:

AOI #4 WAS MEASURED   ' N/N OF 102nd ST +   ' W/W OF
BROADWAY.

DET III LABARBERA (#23421)(SOUTH BUREAU HOMICIDE DET) WAS AT SCENE
UPON OUR ARRIVAL. DET III LABARBERA ADVD THAT THE VEH
NO DRIVER WERE POSSIBLY INVLS IN A HOMICIDE THAT
OCCURED EARLIER THAT MORNING. HE IS HOLDING THE VEH AT
KELMARK TOW FOR EVIDENCE. H/R T/C RPT WAS COMPLETED AT
SCENE AND GIVEN TO DET III LABARBERA.

Holmes-299

| PREPARER'S NAME | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| | | | | |

# MUNICIPAL SUPPLEMENT

Page 5

| DATE | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 2-25-10 | 0330 | 1942 | 36821 | 1018 07-093 |

| JUV PTYS. V. ·ASS ·ECT ·ING | D/P/W # NAME OF PARENTS OR GUARDIAN & SPOUSE OR PERSON WITH WHOM LIVING | ADDRESS | | PHONE | DOB | SCHOOL & GRADE |
|---|---|---|---|---|---|---|
| | | | | | | |

| BKG. INFO | D/P/W # | CHARGE | BOOKING NO. | LOCATION BKD. | D/P/W # | CHARGE | BOOKING NO. | LOCATION BKD. |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

## DUI

| DRIVING ESTABLISHED BY | OPINION OF SOBRIETY: | IN OFFICER(S) OPINION, DRIVER OF | WAS UNDER THE INFLUENCE |
|---|---|---|---|
| ☐ OFCRS. OBS.  ☐ WITS  ☐ 40300.5 V.C. | | OF AN INTOXICANT AND UNABLE TO SAFELY DRIVE A MOTOR VEHICLE. | ☐ YES   ☐ NO |

| BREATH TEST | ADMIN. BY | LOCATION | OBSERV. FOR TEST | TIME FOR 1ST SAMPLE | GCI NO. | READINGS |
|---|---|---|---|---|---|---|
| BLOOD TEST | DRAWN BY | | TIME OBTAINED | | URINE TEST | TIME VOIDED | TIME OBTAINED |

## SUSPECT   USE LINES 2&3 FOR ADDITIONAL SUSPECTS OR FOR CONFLICTING DESCRIPTIONS OF P-1

| | DESCRIBED BY | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | AGE | CLOTHING | OUTSTANDING CHARACTERISTICS |
|---|---|---|---|---|---|---|---|---|---|---|
| P-1 | | | | | | | | | NSS | |
| P- | | | | | | | | | | |
| P- | | | | | | | | | | |

## HLR VEHICLE   USE LINES 2&3 FOR ADDITIONAL SUSPECTS OR FOR CONFLICTING DESCRIPTIONS OF V-1

| | DESCRIBED BY | YEAR | MAKE | MODEL | BODY TYPE | COLOR (TOP/BOTTOM) | OUTSTANDING CHARACTERISTICS | LIC. NO. | LIC. PLATE STATE; OR COLOR OF LETTERS/ BACKGROUND |
|---|---|---|---|---|---|---|---|---|---|
| V- | FUR | 00 | GMC | YUKON | SUV | GRY | IN CUSTODY | 6EOF990 | CA |
| V- | | | | | | | | | |

### V-1

| VEHICLE INSPECTED BY INVESTIGATING OFFICER | INDICATE EXACT LOCATION OF DAMAGE | | EXTENT OF DAMAGE |
|---|---|---|---|
| ☒ YES  ☐ NO | HEIGHT IN INCHES FROM GROUND | LENGTH | ☐ PAINT TRANSFER ONLY |
| IGNITION PUNCHED  ☐ YES ☒ NO | | | ☒ DENT, CREASE, ETC. |
| KEYS IN VEHICLE  ☒ YES ☐ NO | | | ☒ SMASHED FENDER, ETC. |

DESCRIBE DAMAGE AND COLOR PAINT TRANSFER:
MAJOR T/C DAMAGE ON ALL SIDES OF VEH. CRAULED W/STIGUO

### V-2

| VEHICLE INSPECTED BY INVESTIGATING OFFICER | INDICATE EXACT LOCATION OF DAMAGE | | EXTENT OF DAMAGE |
|---|---|---|---|
| ☐ YES  ☐ NO | HEIGHT IN INCHES FROM GROUND | LENGTH | ☐ PAINT TRANSFER ONLY |
| IGNITION PUNCHED  ☐ YES ☐ NO | | | ☐ DENT, CREASE, ETC. |
| KEYS IN VEHICLE  ☐ YES ☐ NO | | | ☐ SMASHED FENDER, ETC. |

DESCRIBE DAMAGE AND COLOR PAINT TRANSFER:

### V-3

| VEHICLE INSPECTED BY INVESTIGATING OFFICER | INDICATE EXACT LOCATION OF DAMAGE | | EXTENT OF DAMAGE |
|---|---|---|---|
| ☐ YES  ☐ NO | HEIGHT IN INCHES FROM GROUND | LENGTH | ☐ PAINT TRANSFER ONLY |
| IGNITION PUNCHED  ☐ YES ☐ NO | | | ☐ DENT, CREASE, ETC. |
| KEYS IN VEHICLE  ☐ YES ☐ NO | | | ☐ SMASHED FENDER, ETC. |

DESCRIBE DAMAGE AND COLOR PAINT TRANSFER:

REPORTING SEQUENCE:  1. Collision Summary  2. All Points of Impact  3. Upon Arrival  4. Traffic Controls  5. Physical Evidence  6. Lighting  7. Photographs  8. Injuries  9. Remarks  10. Statements  11. Arrest Narrative

| PREPARER'S NAME AND I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|
| GORONIO  36821 | 2-25-10 | | 2/c |

M.03.01 (05/07)

Holmes-300

# EXHIBIT COVER PAGE



**H**
EXHIBIT

Description of this Exhibit: Supplemental Interview of Officers R. Campos # 33975 & M. Lanza # 38140

Number of pages to this Exhibit: 1 pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☑ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury

Detective Stacey Szymkowiak #33084
Detective Roger Fontes #34970
Southeast Station
May 19, 2010  0630 hours
Interview of Officers R. Campos #33975 & M. Lanza #38140

At approximately 0630 hours on May 19, 2010, Detective Fontes and I, (Szymkowiak)
interviewed officers Campos and Lanza regarding their primary responder statements from
February 25, 2010.  [Note:  Communications audio has been obtained on the Tac Frequency as
well as the Southeast primary radio channel.]

Officer Lanza was the broadcasting officer, while Campos was the driver officer.  Officer Lanza
stated after initially observing the GMC Yukon traveling south on Avalon Boulevard he ran the
vehicle license plate #6EOF990 via the MDC.  Officers were unable to initially broadcast due to
radio traffic when the attempted to stop the vehicle on 102nd Street.  The first audible broadcast
on the frequency is Officer Lanza indicating that they had a "possible C-37 vehicle," (stolen
vehicle) north bound Broadway from 102nd Street.  Officer Lanza indicated to us that was the last
location that they observed the taillights of the GMC Yukon as they were following west on
102nd Street, from a gap of several blocks away.  Officer Campos estimated that at the time that
Officer Lanza was advising him the vehicle turned north on Broadway, their police vehicle was
on 102nd Street at approximately Main Street.

[It should be noted that the street is residential with parking on both sides of 102nd Street,
however, the street has a very long range of visibility and at night, it would be easy to see the tail
lights at a great distance.]  Officers Lanza and Campos did not see that the vehicle had been
unable to negotiate the full turn north and collided into the fence and torn down building after
crossing the grass island dividing Broadway.  Due to the darkness where the abandoned building
was located and the distance gained by the Yukon, the officers negotiated a northbound turn onto
Broadway and continued looking for the taillights of the Yukon.  The officers never regained a
visual on the vehicle and when they reached 98th Street and Broadway, they discontinued their
search and broadcast that they lost the vehicle at 98th Street and Broadway.  The last seen
location was actually 102nd Street and Broadway, and the broadcast of 98th Street and Broadway
was in fact the officer location and not the location the vehicle was last observed.

Both officers indicated that although they did not get a good look at the driver of the vehicle,
they did note that he was a male Black, and that only one occupant was in the vehicle.

# EXHIBIT COVER PAGE

I

EXHIBIT

Description of this Exhibit: Photos of the Yukon at the
Crash Scene

Number of pages to this Exhibit: 4 pages.

JURISDICTION: (Check only one)

- [ ] Municipal Court
- [ ] Superior Court
- [ ] Appellate Court
- [ ] State Supreme Court
- [✓] United States District Court
- [ ] State Circuit Court
- [ ] United States Supreme Court
- [ ] Grand Jury



Holmes 38